United Tie Company, an Illinois Corporation v. Commissioner.
United Tie Co. v. Commissioner
Docket No. 107232.
United States Tax Court
1942 Tax Ct. Memo LEXIS 10; 1 T.C.M. (CCH) 306; T.C.M. (RIA) 42686; 12/26/1942
*10 Certain payments made by petitioner upon an assumed obligation held to represent the cost of acquiring a capital asset; held, further, a deduction for exhaustion of the asset is allowable. A deduction for other payments made by petitioner is disallowed. Hillsman Taylor, Esq., 908 Union Planters Nat'l Bank Bldg., Memphis, Tenn., for the petitioner. John R. Stivers, Esq., for the respondent. ARUNDELL
Memorandum Opinion ARUNDELL, Judge: The Commissioner determined deficiencies as follows: Income
Excess Profits
Year
Tax
Tax Deficiencies
1937
$7,503.94
$1,286.61
1938
5,086.70
811.56
1939
3,500.24
106.53 In arriving at the deficiencies for each year the Commissioner disallowed a portion of the depreciation claimed and also amounts which had been claimed as part of the cost of railroad ties. The disallowance of the depreciation was assigned as error in the petition, but since neither evidence nor argument has been presented with respect thereto, we deem this issue to be abandoned. This leaves us the only issue to be decided the question whether petitioner may deduct amounts paid each year pursuant to a contract executed in 1933. The facts have been stipulated; we *11 find them as stipulated. A brief summary will suffice for an understanding of the issue. [The Facts] Petitioner is an Illinois corporation with its place of business in Memphis, Tennessee. Its returns for the years involved were filed with the Collector for the district of Tennessee. In 1925 a company known as the J. H. Hines Co., Inc., all of the stock of which was owned by J. H. Hines, entered into a contract with the Southern Pacific Company whereby it was to furnish the latter a large quantity of railroad cross ties over a period of years at stipulated prices. Shortly thereafter the contract was assigned by the Hines Company to another corporation which in turn entered into an agreement with the Tularosa Lumber Products Company under which the latter was to furnish it the cross ties to be delivered to the Southern Pacific Company. There was a default in performance under the contract by the assignee of the Hines Company and the Tularosa Lumber Products Company, and on September 12, 1932, the Hines Company and Southern Pacific entered into a new agreement canceling the old contract and providing that the Hines Company was to furnish 105,000,000 feet of cross ties over a *12 period of eight years from the date of the contract at certain stipulated prices. The agreement contained various provisions regarding the rate at which the ties were to be furnished, one of which was that the minimum and maximum quantities of ties that the seller would be obligated to deliver and the buyer to take in any year would be 12,000,000 and 24,000,000 feet respectively. On the date the new contract was executed, September 12, 1932, the Tularosa Lumber Products Company was indebted to one Benjamin J. Altheimer upon notes aggregating $108,111.97 on which the Hines Company and J. H. Hines, individually, were endorsers and guarantors. On the same date J. H. Hines, individually, was indebted to Altheimer in the further sum of $67,888.03. Petitioner was organized two days later, on September 14, 1932, with an authorized capital of $1,000.00 consisting of 200 shares of no par value common stock, all of which were issued to nominees of Altheimer, who became petitioner's president. Hines was petitioner's vice president and operating manager. On October 1, 1932, for the purpose of carrying out an agreement theretofore entered into by the Hines Company, petitioner, and others, the *13 Hines Company assigned the new contract with Southern Pacific to petitioner. It is stipulated that the assignment was made "in consideration of the United Tie Company [petitioner] agreeing to hold harmless the said J. H. Hines Co., Inc., and J. H. Hines, individually, from loss by reason of the endorsement by J. H. Hines Co., and J. H. Hines, individually, on the note issued by Tularosa Lumber Products Company to Benjamin J. Altheimer in the amount of $108,111.97, and further to pay to said Benjamin J. Altheimer an obligation in the amount of $67,888.03 owed to the said Benjamin J. Altheimer by J. H. Hines, individually." Thereafter, on January 1, 1933, without formal corporate action on the part of either petitioner or Tularosa Lumber Products Company, the assets of the latter were transferred to petitioner and it assumed the obligation of $108,111.97 owing to Altheimer. The assets of Tularosa Lumber Products Company were thereafter, in 1940, disposed of for $2,500. In addition to the foregoing indebtednesses aggregating $176,000, the Hines Company was indebted to Altheimer on January 1, 1933 in the amount of $137,000, evidenced by a note of that date due on or before five years *14 thereafter and endorsed by Hines individually. This amount had been advanced by Altheimer for the purchase of 25,000 acres of land, title to which was taken in Altheimer's name as security. On March 7, 1933 Altheimer and Hines entered into an agreement providing for the full and complete settlement of the amounts due Altheimer. The essence of the agreement was that petitioner, United Tie Company, had executed four notes to Altheimer in the amount of $176,000 dated January 1, 1933, and endorsed by Hines, due serially on or before July 1 of the years 1933 to 1936, respectively, and to secure the payment of said notes the petitioner had agreed with Altheimer that not less than the sum of $4.00 per thousand feet of all ties shipped to Southern Pacific should be allocated and paid to apply on the principal and interest of the notes until the full amount of $176,000 was paid. The agreement recited that Altheimer had advanced the further sum of $137,000 for the purchase of land, as aforesaid, and that the Hines Company, with J. H. Hines as endorser, had given him its note in that amount, dated January 1, 1933, payable in five years. The agreement provided that as collateral security for *15 the payment of this note, Altheimer should retain title to the land and in addition should have an agreement from Hines that after the full and final payment of the notes executed by petitioner in the amount of $176,000, the sum of $2.00 per thousand feet on all ties shipped to Southern Pacific should be paid over to Altheimer to apply on the note of $137,000. After the full payment of these debts Altheimer was to transfer and assign to Hines all the collateral in his hands, except one-half interest in the twenty-five thousand acres of land, but until such final payment all collateral then in his possession was to be retained by him, a list of such collateral being attached to the agreement. Part of the collateral so listed in the attached schedule consisted of all of petitioner's stock and all of the stock and certain bonds of J. H. Hines Tie & Timber Company. On the same date, March 7, 1933, at a special meeting of petitioner's board of directors, the agreement between Hines and Altheimer was ratified and approved by petitioner, the minutes of the meeting reading in part as follows: The matter was discussed by the Directors present, and the action of the officers in executing *16 said notes in the aggregate sum of $176,000.00 to Ben J. Altheimer, and the making of the assignment of four dollars per thousand feet, board measure, on all ties shipped under contract with the Southern Pacific Company until said notes, with interest, have been paid in full, and the further assignment of the sum of two dollars per thousand feet, board measure, on ties shipped, until the payment of the notes of J. H. Hines for $137,000.00 and interest, are paid in full, was unanimously approved. Whereupon the following resolution was offered and unanimously adopted: RESOLVED, that the action of the officers of this corporation in executing the notes of this corporation in the total of $176,000.00 to Ben J. Altheimer, in accordance with the terms of the agreement between the said Altheimer and J. H. Hines and others, and the action in assigning and allocating the sum of four dollars per thousand feet, board measure, in payment thereof, and the further action of the officers of the corporation in allocating two dollars per thousand feet until the payment of $137,000.00 to J. H. Hines, referred to in said contract, be approved, ratified and confirmed. * * * During the taxable years *17 petitioner received from Southern Pacific amounts for cross ties delivered to the latter, and made payments to Altheimer as follows: Amounts
Received
Amounts
From
Paid
Southern
to
Year
Pacific
Altheimer
1937
$232,550.03
$38,513.21
1938
216,462.84
37,626.32
1939
212,983.76
31,049.66
The payments to Altheimer were included by petitioner on its returns as part of its cost of operations. The principal amount of $176,000 was paid in full to Altheimer during the year 1938. On April 12, 1936 Hines, who was petitioner's vice president, died. As a result petitioner was left without an operating manager and ceased as a matter of fact to be an operating company. Thereupon the consolidated Tie Company was organized under the laws of the State of Tennessee and entered upon the performance of the contract between the Hines Company and Southern Pacific, dated September 12, 1932. From April 12, 1936, petitioner acted merely as a conduit through which the payments for cross ties delivered to Southern Pacific were received and through which payments to Altheimer were made. [Opinion] The legal theory upon which petitioner's case has been presented is somewhat *18 confused. The principal ground for the claimed deductions appears to be that the payments to Altheimer were part of the cost of ties, though suggestions are also made that they were in effect royalties or in any event ordinary and necessary expenses of conducting petitioner's business. Respondent's position is that petitioner had assumed the debts due Altheimer and that the mere payment of a taxpayer's indebtedness does not give rise to a deduction authorized by any provision of the Revenue Acts. The agreed statement of facts shows that petitioner was organized for the purpose of acquiring and performing the Southern Pacific contract and at the same time of providing security for, and a definite source of payment to, Altheimer for funds advanced by him to Hines and the Tularosa Lumber Products Company apparently in connection with the prior contract with Southern Pacific. The new contract with Southern Pacific was assigned to petitioner and it promised, in return, to pay the debt of Hines to Altheimer in the sum of $67,888.03 and to save Hines and the Hines Company from loss on their secondary liability as endorsers of Tularosa Lumber Products Company's note to Altheimer in the amount *19 of $108,111.97. It would seem to follow that whatever amounts petitioner was required to pay pursuant to this promise constituted the capital cost to it of acquiring the Southern Pacific contract. A short time thereafter, however, petitioner took over all the assets of Tularosa Lumber Products Company and assumed its obligation to pay Altheimer $108,111.97. The Commissioner determined that this obligation was assumed in connection with a nontaxable reorganization, and there are insufficient facts in the stipulation upon which we could arrive at a contrary conclusion. Consequently, petitioner stood in the shoes of the maker of the notes, Tularosa Lumber Products Company, and when it paid the amount of $108,111.97 it was paying its own primary obligation. We think there is no merit in the contention that in paying its own primary obligation petitioner was also paying consideration for the acquisition of the Southern Pacific contract by relieving the endorsers of their secondary liability. The payment of this amount is clearly stated to have been undertaken in connection with the transfer to petitioner of Tularosa Lumber Products Company's assets rather than for the acquisition of the *20 new Southern Pacific contract. It cannot be said that when a maker pays his note consideration thereby flows to the endorsers. The payment simply erases their secondary liability. A deduction for the payment of petitioner's debt in the amount of $108,111.97 is therefore unallowable. As to the further debt of $137,000 owing by the Hines Company, the statement of facts fails to disclose any connection whatever between petitioner's acquisition of the Southern Pacific contract, which occurred on October 1, 1932, and its agreement on March 7, 1933 to permit the application of $2.00 per thousand feet received from Southern Pacific in payment of the amount of $137,000 due by the Hines Company to Altheimer. This amount had been advanced by Altheimer for the purchase of land in Louisiana, title to which was to vest, upon payment of the amount due Altheimer, one-half in Hines, individually, and one-half in Altheimer. There is no showing that this land was acquired for the purpose of performing the Southern Pacific contract, and so far as appears the arrangement for Altheimer to take $2.00 per thousand feet was nothing more than a private agreement between Hines and Altheimer for the payment *21 of a debt due one by the other. We cannot say, upon the facts that are presented, that these payments were made by petitioner in acquiring the Southern Pacific contract or any other asset, or that they constituted ordinary and necessary business expenses. It results that of the three debts involved, only that in the amount of $67,888.03 was paid as consideration for the acquisition of the Southern Pacific contract. This amount petitioner is entitled to recover by amortization. Ordinarily, the recovery of cost of a contract calling for the delivery of a specified quantity of lumber should be secured by deducting in each year an amount in accordance with the actual exhaustion of the contract in that year. The facts for such a computation, however, do not appear in the present record. Deliveries had been made for several years prior to the taxable years and continued to be made after 1939. The parties have stipulated, however, that the contract was for an eight-year period, and it appears that the amounts received in the tax years were fairly constant. In this state of the record we believe petitioner should be allowed to deduct in each of the tax years one-eighth of $67,888.03. An *22 excess-profits tax liability is asserted for each of the tax years. Such tax is imposed in conjunction with the capital stock tax upon corporations engaged during the taxable year in carrying on or doing business. reversed on another issue, ; . In the instant case it is stipulated that on April 12, 1936, prior to the tax years involved, petitioner ceased as a matter of fact to be an operating company and thenceforth acted merely as a conduit through which payments were received from Southern Pacific and made to Altheimer. In the face of this express stipulation we think respondent erred in determining the excess-profits tax deficiencies. Decision will be entered under Rule 50.